UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON
CIVIL CASE NO: 06-23-JGW

**DOUGLAS J. ALGIE,**                                                            **PLAINTIFF**

**V.**

**NORTHERN KENTUCKY UNIVERSITY,**                    **DEFENDANT.**

**MEMORANDUM OPINION AND ORDER**

On January 27, 2006, plaintiff Douglas Algie initiated this litigation by filing a *pro se* complaint against his defendant employer, Northern Kentucky University, alleging that the defendant had discriminated against him during the course of his employment in violation of Title VII of the Civil Rights Act of 1964.  On February 28, 2007, the defendant moved for summary judgment.  The plaintiff has filed a response, to which the defendant has filed a reply. The parties have consented to final disposition of this litigation by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c).

Based upon the undisputed facts of this case and applicable law, I conclude that summary judgment in favor of all defendants is appropriate.

### I. Facts and Relevant Standard

Summary judgment is only appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.  Most of the facts of this case are undisputed.  To the extent that factual issues remain, the court has drawn all reasonable inferences and construed the facts in favor of the plaintiff, as the

party opposing summary judgment in this case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).

In September 1999, plaintiff Algie was hired for the position of Pre-Press Specialist II ("PPII") in defendant NKU's printing department. At the time Algie was hired, two female NKU employees held PPII positions. On October 10, 1996, Bonnie Smith transferred from a graphic artist position in University Relations to a PPII position in the Printing Department. In addition, Jo Ann Fincken was hired as a contract PPII on July 11, 1997 and designated full-time on July 1, 1998.

One week prior to Algie's start date, NKU filled a second PPII position by hiring Johnny Kennedy. The job description for a PPII when Algie accepted the position was as follows:

> The Pre-Press Specialist is responsible for desktop publishing. That would entail taking copies supplied on a disk or sometimes re-keying the copy, translating that copy, cleaning up the copy that is supplied on disk, placing or scanning in the artwork and photos, design work, preparing proofs, then arranging them into a publication for the printing process. Responsible for film assembly and platemaking. Operation of networked Xerox docutech and small bindery equipment.

Algie's primary responsibilities were in traditional prepress areas such as pre-flighting, platemaking and film assembly. By contrast, the two female PPII employees were assigned responsibilities primarily in or closely related to graphic design.

On April 12, 2001, NKU reclassified the two female employees, Fincken and Smith, to the new position of Pre-Pres Specialist III ("PPIII"), a position designated as one primarily involving graphic design. The reclassification permitted Fincken and Smith to work exclusively in graphic design and to receive additional pay.

More than four years after Fincken and Smith were reclassified, on June 1, 2005, Algie

filed an EEOC charge with the Equal Employment Opportunity Commission alleging that NKU had engaged in gender-based discrimination against him. In the area of the EEOC form stating the basis of the alleged discrimination, the box marked "sex" is checked, but the box marked "retaliation" is left blank. Plaintiff specifically alleged as follows:

> I have been employed as a Pre-Press Specialist since September, 1999. Since July, 2004, I have not been selected for a promotion to the position of Graphic Designer. Joann Fincken and Bonnie Smith, both female, have been given opportunities to develop skills and have been promoted to Graphic Designer positions. Both of these females were hired as pre-press specialists with no previous experience in pre-press. My education, in general and in graphic arts exceeds both Ms. Fincken and Ms. Smith, but I was informed that I would not be given the same opportunity to advance. I believe I have been discriminated against because of my sex, male, in violation of Title VII of the Civil Rights Act of 1964, as amended.

DE #1, Complaint, Exh. 3, EEOC charge. In an attached letter dated April 5, 2005, plaintiff elaborates:

> In the past 300 days two graphic designers were hired into the University Printing Department. One in July of 2004 who was hired from a contract position to a full time regular employee. The other was hired in January of this year as a contract position employee. Prior to this the graphic design department of University Printing consisted of two women who were both promoted from pre-press specialist positions into newly created un-posted positions of graphic designers into a newly created department of graphic design. Both of these women were hired as pre-press specialists with no previous experience in pre-press and were excused from all the responsibilities of the pre-press position with the exception of film output. Both of these women as pre-press specialist were given the opportunity to learn and gain experience working in graphic design for at least two years or more until they had gained enough experience to be promoted in the newly created positions and department. Even though my education in general and in graphic arts exceeds both of these women, I was informed that I would not be given the same opportunity to advance from a pre-press specialist position into graphic design. When the need came for more graphic designers to be hired I was denied the advancement opportunity. My case for discrimination based on gender is centered on the fact that women from typesetting backgrounds without any pre-press experience were allowed to be hired as pre-press specialists only to give them the opportunity to develop skills that could advance them into higher paying positions, because not only were they excused from pre-press job description

> responsibilities but also other tasks outside the realm of pre-press specialist that I had been required to do including; copy center, deliveries, and finishing. Another example of discrimination based on gender is in the fact that when I was hired as a pre-press specialist, I was told all employees had to be cross-trained to work in the copy center. This is a separate position from pre-press specialist and is a lower pay grade position. A person hired as a copy center technician is not required to do pre-press job duties. My job performance evaluations have been based on both of these positions. The female pre-press employees were not required to work in the copy center and neither has [sic] the employees hired subsequently, only the two male pre-press employees are required to work in this lower pay grade position.

The EEOC issued a "right to sue" letter on November 9, 2005, and Algie filed suit in this court on January 27, 2006. Plaintiff's Title VII complaint in this court alleges discrimination based upon gender, and retaliation based upon his complaints about job disparities between male and female PPII employees.

## II. Analysis

### A. Statute of Limitations

Title VII contains strict procedural requirements and time limitations for prosecuting claims of employment discrimination.

> Plaintiffs must typically file a timely discrimination charge with the EEOC in order to bring a Title VII lawsuit. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 407 (6th Cir.1999), *cert. denied,* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). Pursuant to the statutory language of Title VII, the applicable statute of limitations begins to run from the date of "the alleged unlawful employment practice [.]" 42 U.S.C. § 2000e-5(e)(1). Title VII has a dual statute of limitations, which we have explained as follows:
>
>> Usually, if the alleged discrimination occurred more than 180 days prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred. However, if the alleged unlawful practice occurs in a "deferral state" ...which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act.

*Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir., 2001)(quoting *Alexander v. Local 496*,

177 F.3d 394, 407 (6th Cir. 1999). Kentucky is a "deferral state." Accordingly, under Title VII plaintiff Algie was required to first file his discrimination charges with the EEOC within 300 days of the alleged discriminatory acts prior to filing suit in this court. *See also Maurya v. Peabody Coal Co.*, 823 F.2d 933 (6th Cir. 1987)(noting that Kentucky is a deferral state with 300 day limit).

### 1. Sex Discrimination Charge

NKU argues persuasively that Algie's sex discrimination claim is time-barred, because he failed to file it within 300 days of any alleged discriminatory act, as required by 42 U.S.C. §2000E-5(E)(1). Algie's complaints refer to Algie's first two years of employment (1999-2001) when Algie alleges that his employer assigned him to "traditional pre-press tasks" while excusing the two female employees from pre-press job description responsibilities as well as "other tasks outside the realm of pre-press specialist that [Algie] had been required to do including; copy center, deliveries, and finishing." Algie complains that the two female employees had "typesetting backgrounds without any pre-press experience" and should not have been reclassified into PPII positions; however, their reclassification occurred on April 12, 2001. In his EEOC charge, he complains that the women were permitted opportunities to learn graphic design skills for a period of two years or more, while still classified in PPII positions, prior to being hired into the newly-created PPIII graphic design positions.

In his deposition testimony, Algie admitted that his entire sex discrimination claim stems from the alleged initial disparity of job responsibilities between male and female PPII employees, and that he was aware of the alleged discriminatory practices within a year and a half of beginning his employment at NKU. DE #34, Algie Deposition at 108, 121. By his own

admission, therefore, Algie was aware of the alleged disparate treatment not later than April 2001.  However, Algie did not file his EEOC Charge until June 1, 2005, nearly four years after the expiration of the 300 day period.

Algie's complaints about the female employees being reclassified to PPIII positions are also time-barred.  Both Fincken and Smith were reclassified to the newly created PPIII positions in April of 2001.  Since Algie did not file his EEOC charge within 300 days of that date, Algie's claims are time-barred.

In response to the defendant's motion, Algie admits that most of his allegations of gender discrimination occurred outside of the relevant 300 day period, but argues that the effects of the alleged discrimination continued well into the 300-day limitation period.  "Both of these women were given the opportunities to advance into Graphic Design by way of disparities between male and female Pre-Press Specialist II employees."  DE #39, plaintiff's response at 5-6.

In addition to making an argument of continuing discriminatory effects, plaintiff explains that he did not feel "justified" in filing a complaint at the time the alleged discrimination occurred within the statutory 300 day period:

> Although there was disparity between male and female Pre-Press Specialist II employees which was evident at Plaintiff's commencement of employment at Northern Kentucky University, and the advancement opportunities that followed from those disparities occurred previously to 300 days before Plaintiff's charge with the EEOC, Plaintiff was informed that tenure and seniority played a part in those decisions. . . Because Plaintiff could not deny that both Bonnie Smith and Jo Ann Fincken were hired before Plaintiff, it was not until Defendant hired another full-time regular employee in a Graphic Design position, that Plaintiff felt justified to pursue a complaint and ultimately a charge.  Defendant acknowledges posting a contract position in February of 2003. . . Defendant filled this position again in September of 2003. . . A contract position expired; a new position was created and filled again without posting the position on July 1, 2004. . . It was at that time Defendant demonstrated a need for additional staffing in the area of Graphic Design on a regular full-time basis and despite Plaintiff's education and

> experience Plaintiff was being denied the same promotion and reclassification opportunities that were extended to Bonnie Smith and Jo Ann Ann Fincken. . . .It was at this time that the disparities in the Pre-Press Specialist II position became relevant. . . . Andy Meeks Director of Auxiliary Business Operations, acknowledged a need for additional staffing in Graphic Design, created a new contract position, and without posting this position filled it with Mike Meiners. . ..

DE #39, Plaintiff's response, at 6-7

Plaintiff cannot bring his claims within the 300-day period by alleging that he was denied promotion opportunities due to discrete acts which occurred outside of the limitations period. Therefore, whether the job assignments or failure-to-promote events Algie complains of occurred in 1999 or 2001 or 2003, all are time-barred. The only actions which Algie alleges occurred within the 300-day period were NKU's hiring of two other individuals into graphic design positions in July 2004 and January 2005, in lieu of promoting him.

In his response in opposition to summary judgment, plaintiff complains that another male (Mike Miner) was hired into a contract Graphic Design position in July 2004 but provides no details concerning any person hired in January 2005. However, in plaintiff's original complaint and in the defendant's reply memorandum, both parties refer to the July 2004 event as involving a female contract graphic designer (Leigh Ober) being reclassified to a full-time graphic design position. In addition, in his original complaint plaintiff alleges that the July 2005 hire was Mike Miner.

To the extent that plaintiff complains of Ober's reclassification within the relevant 300-day period, that action cannot form the basis of his gender discrimination claim because there is no evidence that Ober - who had been working successfully in a Graphic Designer contract position- was reclassified based upon her gender. Similarly, the hiring of another *male* employee into a contract position for Graphic Design cannot support plaintiff's claim of gender

7

discrimination.

In the end, plaintiff's primary claim - that female employees have been provided promotion opportunities over the years while he has not - is squarely barred by the limitations period set forth in Title VII, as most recently explained by the Supreme Court in *Ledbetter v. Goodyear*, 127 S. Ct. 2162 (May 29, 2007).   In *Ledbetter*, the plaintiff alleged that she had received poor evaluations during the course of her employment because of her sex, and that the resultant past pay decisions continued to affect her pay throughout her employment.  However, only two denials of raises occurred within the 300 day period, and there was insufficient evidence to prove that Goodyear had acted with discriminatory intent concerning those two discrete pay decisions.  The Supreme Court held that the plaintiff could not rely upon the alleged past conduct to buttress a claim of present discrimination.

Because this court cannot summarize Supreme Court precedent on this issue more clearly than did the majority in *Ledbetter*, the Supreme Court's recent analysis is quoted at length:

> In addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. *Morgan,* 536 U.S., at 110-111, 122 S.Ct. 2061. Ledbetter points to two different employment practices as possible candidates. Primarily, she urges us to focus on the paychecks that were issued to her during the EEOC charging period ... . Alternatively, Ledbetter directs us to the 1998 decision denying her a raise, and she argues that this decision was "unlawful because it carried forward intentionally discriminatory disparities from prior years." ... Both of these arguments fail . . .. Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior to* the EEOC charging period. .... Similarly, she maintains that the 1998 decision was unlawful because it "carried forward" the effects of prior, uncharged discrimination decisions. ... **In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period**. .... **This argument is squarely**

**foreclosed by our precedents.**

In *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), we rejected an argument that is basically the same as Ledbetter's. Evans was forced to resign because the airline refused to employ married flight attendants, but she did not file an EEOC charge regarding her termination. Some years later, the airline rehired her but treated her as a new employee for seniority purposes.... Evans then sued, arguing that, while any suit based on the original discrimination was time barred, the airline's refusal to give her credit for her prior service gave "present effect to [its] past illegal act and thereby perpetuate[d] the consequences of forbidden discrimination." *Id.,* at 557, 97 S.Ct. 1885.

We agreed with Evans that the airline's "seniority system [did] indeed have a continuing impact on her pay and fringe benefits," *id.,* at 558, 97 S.Ct. 1885, but we noted that "the critical question [was] whether any present *violation* exist[ed]." *Ibid.* (emphasis in original). We concluded that the continuing effects of the precharging period discrimination did not make out a present violation. As Justice STEVENS wrote for the Court:

> "United was entitled to treat [Evans' termination] as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). A discriminatory act which is not made the basis for a timely charge ... is merely an unfortunate event in history which has no present legal consequences." *Ibid.*

It would be difficult to speak to the point more directly.

Equally instructive is *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). . . . In March 1974, Ricks was denied tenure, but he was given a final, nonrenewable one-year contract that expired on June 30, 1975. . . . .Ricks delayed filing a charge with the EEOC until April 1975, . . .but he argued that the EEOC charging period ran from the date of his actual termination rather than from the date when tenure was denied. In rejecting this argument, we recognized that "one of the *effects* of the denial of tenure," namely, his ultimate termination, "did not occur until later." . . . But because Ricks failed to identify any specific discriminatory act "that continued until, or occurred at the time of, the actual termination of his employment," . . ., we held that the EEOC charging period ran from "the time the tenure decision was made and communicated to Ricks," *id*., at 258, 101 S.Ct. 498.

This same approach dictated the outcome in *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). . . .Before 1979, all employees at the plant in question accrued seniority based simply on years of employment at the plant. In 1979, a new agreement made seniority for workers in

9

the more highly paid (and traditionally male) position of "tester" depend on time spent in that position alone and not in other positions in the plant. Several years later, when female testers were laid off due to low seniority as calculated under the new provision, they filed an EEOC charge alleging that the 1979 scheme had been adopted with discriminatory intent, namely, to protect incumbent male testers when women with substantial plant seniority began to move into the traditionally male tester positions. *Id.,* at 902-903, 109 S.Ct. 2261.

We held that the plaintiffs' EEOC charge was not timely because it was not filed within the specified period after the adoption in 1979 of the new seniority rule. We noted that the plaintiffs had not alleged that the new seniority rule treated men and women differently or that the rule had been applied in a discriminatory manner. Rather, their complaint was that the rule was adopted originally with discriminatory intent. . . .And as in *Evans* and *Ricks,* we held that the EEOC charging period ran from the time when the discrete act of alleged intentional discrimination occurred, not from the date when the effects of this practice were felt. . . ..

Our most recent decision in this area confirms this understanding. In *Morgan,* we explained that the statutory term "employment practice" generally refers to "a discrete act or single 'occurrence' " that takes place at a particular point in time. 536 U.S., at 110-111, 122 S.Ct. 2061. We pointed to "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of such "discrete" acts, and we held that a Title VII plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.,* at 114, 122 S.Ct. 2061.

The instruction provided by *Evans, Ricks, Lorance,* and *Morgan* is clear. **The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.** But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See *Morgan, supra,* at 113, 122 S.Ct. 2061.

*Ledbetter v. Goodyear Tire & Rubber Co., Inc*. 127 S.Ct. at 2167-2169 (boldface added, citations omitted).   Because no discriminatory discrete acts occurred within the relevant 300-day period prior to the filing of plaintiff's June 1, 2005 EEOC charge, the defendant is entitled to summary judgment on plaintiff's claims of sex discrimination.

### 2.  Retaliation Claim Also Procedurally Barred

In the complaint filed in this court, plaintiff alleges that in addition to discriminating against him based upon his gender, the defendant violated Title VII by retaliating against him based upon his verbal complaints of gender discrimination.

> After expressing my position concerning the unfairness of the situation, I found myself being given the most demeaning and tedious tasks, most of which were not associated with the position I was hired for. I believe I was being subjected to retaliation for challenging this issue. These retaliatory acts by George Hardesty and Kathy Dawn included: being required to perform campus deliveries on a regular basis, working extensively in the copy center (which is not a function of pre-press operations), and requiring me to performing [sic] finishing operations.

DE #1, Complaint.

NKU argues persuasively that plaintiff's retaliation claims are procedurally barred. In his EEOC claim, plaintiff failed to check the box for "retaliation" or to allege any facts to support a retaliation claim under Title VII. Although *pro se* complaints are construed liberally, where a claimant fails to make a retaliation claim before the EEOC and fails to allege any facts which would support such a claim, a retaliation claim pleaded for the first time in federal court will be procedurally barred. *See Abeita v. Transamerica Mailings,* 159 F.3d 246 (6th Cir. 1998).

In this case, plaintiff admits that the retaliatory conduct of which he complains preceded the filing of his EEOC complaint, and that he did not "detail the retaliatory acts...in writing." However, he argues that his retaliation claim should not be barred because it was "discussed during the course of the EEOC's investigation." Plaintiff's conclusory and unsubstantiated assertion that the EEOC discussed unpleaded retaliation claims during its investigation of his underlying disparate treatment claim is insufficient to defeat defendant's motion for summary judgment. *Accord Calloway v. University of Louisville*, 2006 WL

11

1523229 (W.D. Ky. 2006)(dismissing claim where retaliation claim involved conduct which could have been alleged in original EEOC charge).

In addition, plaintiff's retaliation claim is time-barred. Algie testified in his deposition that the alleged retaliation occurred within a year and a half to two years of beginning his employment at NKU in 1999, years prior to the expiration of the relevant 300-day period. DE #34, Deposition at 186. Although in his response plaintiff newly asserts that the retaliation "continued until after Plaintiff's civil complaint...was filed on January 27, 2006," he previously testified in his deposition that NKU had not retaliated against him either after he filed the EEOC charge or for filing this lawsuit. *Id.* at 191 ("No, I would say not. In fact, they're very careful not to take any retaliatory actions now.") Plaintiff cannot defeat summary judgment by making unsubstantiated assertions in his response which contradict his prior sworn testimony.

Finally, the three specific retaliatory acts included by plaintiff in his complaint include: 1) being forced to work in the Copy Center; 2) perform campus deliveries, and 3) perform finishing operations. However, plaintiff has produced no evidence that any of these duties (all of which appear to fall within the relevant job description for a PPII position) can be considered "adverse employment action." Similarly, plaintiff has produced no evidence that the tasks he was assigned were in retaliation for comments made by plaintiff to Hadesty not later than April of 2001.

### B. Prima Facie Case

As an alternative to the procedural grounds presented in favor of summary judgment, NKU argues that Algie cannot prove a *prima facie* case. Because I conclude that all of

Algie's claims are barred for procedural reasons, I decline to reach defendant's argument that Algie cannot prove either that he is qualified to work in graphic design or that he was similarly situated to the two female employees who were promoted, both of whom had been employed for a longer period of time.

### III. Conclusion and Order

For the reasons stated herein, **IT IS ORDERED** that the defendants' motion for summary judgment [DE #35] is **granted** and that this action be stricken from the active docket of this court.

This 23rd day of July, 2007.

Signed By:
J. Gregory Wehrman
United States Magistrate Judge